PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JUAN GARCÍA (*alias*) EL PERLA, Defendant and Appellant.

No. 6717. Argued November 15, 1937.—Decided November 18, 1937

*Angel M. Villamil* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

The District Attorney of San Juan filed an information against Juan García (*alias*) El Perla, charging him with a violation of Section 1 of the Act to prohibit the carrying of weapons approved June 25, 1924, in that "..... on or about the 20th day of January of 1936, and in the Municipality of

San Juan, Puerto Rico, which forms part of the judicial district of San Juan, P. R., he did unlawfully and willfully carry a revolver, said revolver being a weapon with which bodily injury may be caused."

The defendant pleaded not guilty, and the trial having been held, he was sentenced by the court to thirty days in jail. He took an appeal, and the record of his appeal was filed in the office of the secretary of this Court on the 25th of June last.

The appellant did not file his brief within the statutory term, and on October 13, 1937, the Fiscal moved to dismiss the appeal on that ground, and also, because it did not appear from the record that any fundamental error had been committed, the appeal being therefore frivolous.

The hearing of the motion having been set for November 15, on the 13th the appellant requested the admission of a brief which he submitted, and on the day of the hearing he insisted on his request, and consented to a final decision of the case once the court had weighed the reasons set forth by him. Both the appellant through his counsel and the Fiscal submitted oral arguments.

As the motion of the Fiscal to dismissal on the ground of frivolousness goes also to the merits of the appeal and the whole record is before us, we shall dispose of the case finally.

We have read the information. The evidence for the prosecution consisted in the testimony of two witnesses; that for the defense in the testimony of three witnesses in addition to the defendant's own testimony.

The first witness for the prosecution, Erasmo López, an insular policeman, stated that in San Juan, on January 20, 1936, at 11:00 A. M., he took a revolver from the defendant on Fernández Juncos Avenue at the corner of General Hynes Street, beside the distillery of Dávila Hermanos; that the defendant "first came out from an automobile and entered into the P.R.E.R.A. building. A boy named Ramón Crispín

was talking with me and I said to him: 'Well, he got in already .... let us see if he leaves it there', but he came out again and when he reached the corner, at about the rush hour when the P.R.E.R.A. employees usually leave, he was in his shirt sleeves and I seized his revolver ....''

Upon being examined by counsel for the defense, he stated that he seized the revolver at a distance of some sixty meters from the P.R.E.R.A. building, and later on, upon being further examined by the prosecuting attorney, he explained that the sixty meters were measured from the front door of the building and that the seizure took place on the highway in front of Dávila Hermanos, the other building of the P.R.E.R.A., the fruit warehouse, being at a distance from 250 to 300 yards apart.

The testimony of Ramón Crispín, the second witness for the prosecution, corroborates that of the first witness.

The evidence for the defense began with the testimony of Reinaldo Cestero, chief of the food-supply warehouses of the F.E.R.A. He said that on or about the date of the complaint they were receiving great shipments of food supplies and that they had three warehouses, one on Isabel II Street, another in Puerta de Tierra, Stop 4, and the third in La Colectiva, and that owing to the fact that some bombs had been thrown, several employees were authorized by the court to carry weapons; that the defendant worked as a watchman in the Communications and Service Building, his duty being to watch over the food supplies stored in the warehouses and that for that reason he had been authorized to carry a weapon within the warehouses. Upon being asked by the district attorney if he had obtained a permit from the court to carry a weapon, the defense intervened and said, ''We do not claim that; the court did not grant him any such permit.''

Abraham Robles said that he sought employment in the P.R.E.R.A. and that they sent the defendant to take him to the warehouse; ''we left the building, and when he had walked a distance about this long, the policeman came out

from behind an automobile and seized the revolver from him.''

Luis Peña Ramos stated that the defendant was an employee under his orders in the Communications and Service Division who sometimes acted as a watchman, that ''in those times there was a justified state of alarm caused by shots that were fired at the F.E.R.A. buildings,'' the door of the building which leads to the railroad station having been once dynamited; that he granted permission to the defendant to carry a weapon to be used as by other employees of the P. R. E.R.A., who ''use the weapons in and outside the building, because they go from one building to another, as it happened in the F.E.R.A.''

Finally, the defendant testified, and he said that on the date of the complaint his duty was ''to allow no parking of automobiles in front of the P.R.E.R.A. buildings, and at the same time I acted as a watchman; observing all those who came out with packages for the purpose of searching them .... when I was called from a warehouse, I used to go and look over .... I paid special attention at the closing hour, the time in which employees could take away things .... I went to ask Mr. Cesteros to employ Abraham Robles, the witness who testified here; I was in the warehouse and this gentleman came to ask for employment, but as the person in charge of the warehouse could not employ him, I came to Mr. Cesteros and Mr. Cesteros ordered me to take Robles to a warehouse located near the P.R.E.R.A..... When the situation was normal we watched without weapons, but after two or three bombs were thrown we had to watch more carefully, because as we were employed there, we had to watch and go around the buildings to prevent the parking of automobiles near the buildings and to keep people moving. There were also some thefts and in order to prevent them, we had to be very watchful.... Then Mr. Bourne gave orders so that we could carry weapons while on duty within the warehouses. Many times we went home with our revolvers; we

had to take them with us because they could not be left there .... Many times they were left there, when we could find a proper place."

The law is definite. The defendant was not one of the persons authorized to carry a weapon—Section 6 of Act No. 14 of 1924, Penal Code (1937 ed.) page 408—, nor did he have any permit therefor from the district court.

This is admitted by the appellant himself, but he maintains that his case is covered by the exception established by the decision of this Supreme Court in *People* v. *Bosch,* 43 P.R.R. 711, since he was a watchman authorized to carry a weapon within the warehouses of the P.R.E.R.A., and even though his revolver was seized on the highway, the seizure took place while he was going from one warehouse to another in official business.

The *Bosch* case, *supra,* was decided by a divided court. The doctrine which was established by the prevailing opinion is summarized as follows:

"A '*mayordomo*' or overseer of a farm is within his own property when acting as such 'mayordomo' or watchman. He has necessarily the use and occupation of the property that he traverses, and it is not necessary that he should live thereon or that the owner should lease an interest in the land to him or give him some nominal titular right to be in the property.

"A watchman of a farm does not cease to be such watchman when, to reprimand or restrain a person taking grass from the property of his employer, he goes upon the highway. The going unto the highroad under such conditions would be clearly within his duties. Inasmuch as he has a right to carry a pistol while performing his duties, and as his going unto the highroad would be a deed or performance entirely within his employment or the scope thereof, while he is on the highroad under such conditions, he does not carry a prohibited weapon within the meaning of the statute."

As may be readily seen, the above doctrine is not applicable to the facts of the instant case. We are of opinion that the evidence here is doubtful as to whether the defendant was duly authorized to carry a weapon within the ware-

houses and as to whether he was really a watchman. However, apart from this or giving him the benefit of any doubt, and admitting that he was a watchman authorized to carry a weapon within the warehouses under his vigilance, it was not shown that he left the warehouse and went unto the high-road carrying a weapon in pursuit of any person committing an unlawful act in the warehouse or for some reason of that sort.

The seizure of the weapon took place on the open road, at a considerable distance from the building wherein the defendant worked, and even if credence were to be given to his theory that he was in the act of performing some duty while going from one building to another of the same governmental agency, we would always have to conclude that such service had nothing to do with the vigilance of the food supplies, not to mention the fact that, even though there would have been some connection between such service and said vigilance, it would not constitute a reasonable explanation of the dire necessity in which he found himself of going out carrying a weapon.

If there was really a state of alarm, if the service of armed watchmen was truly necessary to guard the warehouses, the P.R.E.R.A. had the means to obtain the legal authorization from the district court, which means were known to that organization and were employed by it when deemed convenient, as shown by the evidence for the defense. Everything leads us to believe that this was a case of the carrying of a prohibited weapon without justification and that, therefore, the policeman who seized it, the prosecuting attorney who filed the information, and the judge who rendered the judgment of conviction, complied strictly with their respective duties, and hence the judgment must be affirmed.

Mr. Justice Córdova Dávila took no part in the decision of this case.